## IN THE COURT OF APPEALS OF IOWA

No. 21-1122
Filed October 20, 2021

**IN THE INTEREST OF E.K.,**
**Minor Child,**

**L.K., Mother,**
　　　Appellant.

_____

Appeal from the Iowa District Court for Clayton County, Linnea M. N. Nicol, District Associate Judge.

The mother appeals the termination of her parental rights.  **AFFIRMED.**

MaryBeth A. Fleming, Dubuque, for appellant mother.

Thomas J. Miller, Attorney General, and Michelle R. Becker, Assistant Attorney General, for appellee State.

Gina Kramer of Kramer Law Office, Dubuque, attorney and guardian ad litem for minor child.

Considered by Tabor, P.J., and Greer and Badding, JJ.

**PER CURIAM.**

L.K., mother, appeals from the termination of her parental rights to her child, E.K.[1]  While L.K. has remained involved in her child's life and been receptive to and cooperative with parenting-related services, due to continued instability and poor choices, she had not progressed to the point where the child could be returned to her care at the time of the termination hearing.  We affirm.

**I. Background facts and proceedings.**

The Iowa Department of Human Services (DHS) became involved with the family in 2018 when the mother required hospitalization after using un-prescribed oxycodone and expressing suicidal thoughts.[2]  E.K., then six months old, was adjudicated a child in need of assistance in November 2018.  The child remained in her mother's care until L.K. was hospitalized again the following May.  Over concerns with the mother's stability, the child was placed in the custody of DHS and then with her father, J.F.  Less than a year later, J.F. asked a friend to drive him to Iowa City for a surgery.  When his friend sent a text message to check in the next day, J.F. failed to respond.  Without notifying DHS, J.F. had bought bus tickets for himself and both children and was on his way across the country with E.K.  The child was returned to Iowa by her paternal grandparents and again placed in DHS custody.  L.K. was staying in a host home at that time, which acts like a foster home for adults with disabilities.  L.K. and E.K. started visits in this

---

[1] E.K. was born in 2018 and shares a father with a half-sibling, C.F., born in 2012. Both children were involved in this termination-of-parental-rights filing, but because their father, J.F., failed to file a timely petition on appeal, his appeal related to both children was dismissed.

[2] It is disputed whether or not J.F. was the source of the pills.  Drugs have not been a continued concern.

home, and eventually E.K. was placed there as well. Unfortunately, L.K. had to be removed from that home by law enforcement following threats and a physical altercation with the host family. By the time of the termination hearing, L.K. was living in an apartment on her own, and E.K. was still with the host home with her half-sibling.

Though J.F. is not party to this appeal, his presence in L.K.'s life is central to the State's concern about L.K. retaining parental rights. J.F. has been diagnosed with schizophrenia, manifesting in auditory and visual hallucinations, for which he refuses services or treatment. He instead manages his mental health with diet and exercise. J.F. believes that DHS became involved with his family to groom his children for a future in the sex trade. He has a history of violent and threatening behavior and angry outbursts.[3] He did not participate in any services other than visitation and often refused to take drug tests. When once asked to do a urine analysis during a visit, he became "explosive" and angry in front of his children, leaving after he threw a chair. Both the children and L.K. were described to be frightened and curled up on one side of the room. E.K.'s foster placement explained that the child was inconsolable that night and screamed until falling asleep. At no point in the proceedings did J.F. admit he had done anything wrong in parenting his children.

Visits were originally occurring with both parents at L.K.'s apartment. Before her first partially-supervised visit, L.K. said she was afraid of J.F. and had

---

[3] J.F.'s Facebook page shows what he calls "poetry" and "graphic expressions of pain," riddled with phrases like "it was my turn to kill somebody in town" and references to sexual assault.

a hard time saying no to him. DHS began doing visits separately. Providers told L.K. that if J.F. came to the apartment, she was not to let him in and instead call the police. At the visit, J.F. arrived at the home with doughnuts; L.K. asserts that she just took the doughnuts and told him to leave. Visits returned to being fully-supervised. Not long after, L.K. asked that joint visits begin again because she wanted E.K. to have her father in her life. Both parents were interested in co-parenting. Even at the time of the termination hearing, when J.F. was in jail on harassment charges, L.K. said she still cared about him as E.K.'s father and asked providers what it would take to get him out. While she testified that she would not continue to communicate with him if the case closed, there are serious concerns that she is easily manipulated by him and does not understand the danger he and his behavior pose to E.K.

But concerns about L.K. went beyond the issues involving her relationship with J.F. In the category of poor choices, L.K. interacted with a string of strangers she met on the internet, some with a history of addiction or criminal behavior, without acknowledging the risk of having them around E.K. Providers taught her how to look someone up on Iowa Courts Online or the sex offender registry to determine if they were safe to have around the child. Still, L.K. did not seem to grasp the risk in having dangerous or unknown persons around E.K. Just months before the termination hearing, L.K. had a stranger in her home and became angry when her family would not let her take E.K. to meet him. Rather than trusting service providers, on many occasions, L.K. listened to negative outside influences. For instance, she would often look for J.F.'s approval before following a case worker's instructions. And she reported taking cannabidiol (CBD) for her anxiety

on the recommendation of a friend instead of consulting with her mental-health providers.

We acknowledge the progress L.K. made during the involvement with DHS. Yet, although L.K. receives adult services to assist with an intellectual disability (independent from her DHS-provided services), she is more receptive to some than others. To her credit, she consistently attends her counseling sessions and medication management. She has missed visits with E.K. but only when she or the provider were sick. She listens to parenting advice and attempts to follow it in the moment; however, she does not seem to truly absorb the information and often has to be reminded in subsequent visits. L.K. also struggled with recognizing basic safety concepts such as checking who was at the door before opening it or the hazards of having a broken window. As for the adult services offered to her, L.K. often canceled and was at risk of losing the services altogether. In fact, she made repeated threats of terminating her adult services—jeopardizing her support to, among other things, help manage her finances and ensure her rent and utilities get paid.

Finally, emotional stability of L.K. remains a concern. L.K. has a history of issues with emotional regulation and anger management. DHS reports discuss her getting angry and walking away during visits, leaving E.K. behind with providers, or getting territorial when she thinks E.K. might like someone better than her. There was also an incident where L.K. was trying to bathroom train E.K. and became frustrated and forceful with E.K. This led E.K. to a fear of the restroom not only with L.K., but with her foster family and daycare. L.K. reports that a

common trigger for her frustration is her family. She and her mother[4] often fight, though both her parents and sisters are involved in L.K.'s and E.K.'s lives and have offered their continued support if she retains her parental rights. The reports also show providers for L.K.'s adult services were concerned with her drinking, documenting slurred voicemails cancelling services scheduled for the next day. The foster family caring for the child reported that when L.K. would lose her temper during a visit or something else would go awry, E.K. would mirror the troubling behavior at home.

The State petitioned to terminate both parents' rights in March 2021. When the hearing on the termination of parental rights began to loom closer, E.K.'s paternal grandparents started the process of becoming licensed as adoptive parents in their state. At the time of termination hearing, the paternal grandparents had intervened in the case. An interstate compact home study was pending, and the grandparents were willing to take both E.K. and her sibling, who are strongly bonded and have mostly lived together since E.K.'s initial removal in 2018.

In August 2021, the mother's parental rights were terminated under Iowa Code section 232.116(1)(h) (2021), and L.K. filed a timely appeal.

**II. Discussion.**

We review the termination of parental rights de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). Our evaluation of a termination of parental rights typically follows a three-step framework. *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010). We examine (1) the statutory grounds for termination, (2) the best interests

---

[4] L.K.'s mother remains her legal guardian.

of the child, and (3) whether any statutory exceptions listed in Iowa Code section 232.116(3) would apply. *Id.* at 706–07; *see* Iowa Code § 232.116.

L.K.'s rights were terminated under Iowa Code section 232.116(1)(h). She asserts the State did not meet the required burden to prove the statutory ground. She also challenges the termination because, due to the strength of the bond between her and E.K., termination is not in E.K.'s best interests consistent with Iowa Code section 232.116(3)(c). These are two distinct steps in the framework, and we consider them individually. *In re B.S.*, No. 20-0929, 2020 WL 5651693, at *3 ("We choose to separately address the often-conflated best-interests and statutory-exception arguments.").

**A. Statutory grounds of termination.**

To terminate parental rights under Iowa Code section 232.116(1)(h), the child must (1) be three years old or younger; (2) have been adjudicated a child in need of assistance under Iowa Code section 232.96; (3) have been removed from the physical custody of their parents for at least six of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days; and (4) the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the time of the termination hearing. *See D.W.*, 791 N.W.2d at 707 (interpreting "at the present time" in section 232.116(1)(h)(4) to mean "at the time of the termination hearing"). L.K. challenges only the fourth prong. She argues the State failed to prove by clear and convincing evidence that she was unable to have E.K. returned to her care.

L.K. correctly advocates that many of the "usual precursors to termination of parental rights, such as physical or emotional abuse of the child, substance

abuse by one or both parents, domestic abuse, parental criminal conduct, or even overt neglect" are absent from this case. *In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014). And, she has progressed some since services have been instituted. Still, "[s]ome progress is not enough." *In re C.F.*, No. 99-2017, 2000 WL 1724591, at *4 (Iowa Ct. App. Nov. 20, 2000). L.K. does not appreciate the negative impact her relationship with J.F. has on her child and does not have any sense of urgency to set boundaries with him. Even in moments where she did exhibit concern and try to put distance between herself and J.F., her resolve was swayed by the desire for E.K. to have a father irrespective of the threat presented. The same lack of risk evaluation was present with the other strangers E.K. would be exposed to without proper vetting. Her "demonstrated lack of protective capacity creates an appreciable risk of adjudicatory harm to the child." *In re A.J.*, No. 17-1796, 2018 WL 347766, at *2 (Iowa Ct. App. Jan. 10, 2018). Further, her continued emotional instability, which is already manifesting effects in E.K., has not resolved itself enough to alleviate the concern. *See In re M.M.G.C.*, No. 10-1478, 2010 WL 4485692, at *2 (Iowa Ct. App. Nov. 10, 2010) ("While [the mother] strives to be a good parent and comply with the provided services, she has been unable to control her emotions and anxiety to the extent she can provide a stable and safe environment for [the child].").

On some fronts, this case is similar to *A.M.*, 843 N.W.2d at 112, because "some of the individual incidents cited by DHS may seem trivial and other concerns may appear to be nebulous." But, just as in that case, the abstract taken together shows a clear picture of a parent who has not made the necessary progress to have her child returned to her care. *A.M.*, 843 N.W.2d at 112 ("The only

opportunity for evaluating [the mother and father]'s parenting came during the supervised and semisupervised visits, because the couple never progressed to a trial period with [the child] at home. Thus, inferences had to be drawn as to how safe [the child] would be with [the mother and father] based upon limited data points."). The State met its burden of proof to terminate under section 232.116(1)(h).

### B. Best interests of the child.

Once we determine that a statutory ground has been met, we next evaluate whether the termination is in the best interests of the child under Iowa Code section 232.116(2). *In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010). The Code directs the court to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code 232.116(2).

L.K. argues that terminating her parental rights is not in E.K.'s best interests as she does not believe that the State has provided any concerns beyond what *might* happen to E.K. were she placed back in L.K.'s care. Our best interests evaluation, however, looks not only at what the parent could provide the child at present, but what the future would likely hold if the child was returned to the parent's care. *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006). On top of the concerns already discussed surrounding L.K.'s protective capacity and mental stability, L.K.'s long-term housing is also in peril. While she is compliant with some of the adult services she receives independent of DHS's involvement, she was hostile toward those that would ensure she maintained the stability she claims she could offer E.K. *See M.W.*, 876 N.W.2d at 223 (terminating parental rights when a

parent, in part, "continue[d] to make decisions without thinking of the impact on her children"). This is not a theoretical concern, but an imminent threat.

No one questions that L.K. loves E.K. or that L.K. has made some progress after years of services—the progress simply has not been enough to take over full-time parenting of E.K. "Children simply cannot wait for responsible parenting." *In re L.L.*, 459 N.W.2d 489, 495 (Iowa 1990). We will not ask E.K. to wait now.

### C. Bond between mother and child.

Finally, L.K. asserts that the bond between her and E.K. is strong enough to overcome termination. Section 232.116(3) allows a court to consider exceptions that would prevent termination and includes the detriment to the child "due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). E.K. has been out of L.K.'s care since she was an infant. And while L.K. has been consistently present at visits and is attentive to E.K., her emotional instability leads her to become frustrated and distracted. E.K. does call L.K. "Mama" but treats her more as a playmate than as someone to offer care. Likewise, E.K. experiences "meltdowns" when she realizes she is going to a visit and displays behavioral issues at home afterwards. None of this reflects a bond whose severance would be detrimental to E.K.

In the overall picture, E.K.'s strongest familial bond is with her half-sibling who was previously involved in this case. Testimony at trial stated that the two would be devastated if they were separated. The older child is very protective of E.K., and both children are said to be the other's source of stability. When possible, siblings should be kept together, *In re L.B.T.*, 318 N.W.2d 200, 202 (Iowa 1982), and we find this particularly true for these siblings.

It is undoubtable that L.K. loves her child, but the detriment of severing the bond between mother and child does not overcome the grounds for termination.

## III. Conclusion.

While we commend L.K. for her efforts and consistent presence in E.K.'s life, her progress was not sufficient to have E.K. returned to her care at the time of termination. We affirm the juvenile court's ruling.

**AFFIRMED**